**David Luna VARGAS, et al., Plaintiffs,**

v.

**Edwin MEESE, III, et al., Defendants.**

**Civ. A. No. 87–2641–OG.**

United States District Court,
District of Columbia.

Oct. 5, 1987.

Kristine A. Poplawski, Washington, D.C., for plaintiffs.

Daniel E. Bensing, Asst. U.S. Atty., Washington, D.C., for defendants.

### MEMORANDUM

GASCH, District Judge.

## I. INTRODUCTION

This matter is before the Court on plaintiffs' motion for a preliminary injunction to prohibit defendants from refusing to accept applications by plaintiffs and their proposed class members for a change of status under the Special Agricultural Worker ("SAW") program. *See* 8 U.S.C. § 1160. Plaintiffs seek the rights and benefits accorded to applicants of the SAW program under the statute. *Id.* Plaintiffs challenge an Immigration & Naturalization Service ("INS") regulation, which provides that aliens entering the United States after June 26, 1987, may not file such applications from inside the United States, but may only file from outside the country. *See* 8 C.F.R. § 210.2(c)(1).

Plaintiffs entered this country with temporary visas that were issued pursuant to 8 U.S.C. § 1101(a)(15)(H)(ii) (current version at *id.* § 1101(a)(15)(H)(ii)(a)) ("H–2" and "H–2A") to work in the Virginia tobacco harvest. By statute, 8 U.S.C. § 1160, they are eligible to apply for a change of status and to be accorded the rights and benefits under the immigration laws and INS policies. Those rights and benefits include employment authorization and immunity from deportation or exclusion, pending the adjudication of their SAW applications. Plaintiffs ask the Court to order that defendants be prohibited from failing to consider those H–2 and H–2A aliens, who last entered the United States after June 25, 1987, as eligible to file applications in the United States. Plaintiffs do not seek to have their applications adjudicated pending the resolution of this action, but merely to file their applications and to be accorded the rights granted by statute to SAW applicants.

Plaintiffs also seek to maintain a class action on behalf of all persons who entered the United States on H–2 or H–2A temporary work visas on or after June 26, 1987 to work in the Virginia tobacco harvest and who seek to file an application for adjustment of status under section 210 of the Immigration and Nationality Act (the "SAW" program). According to plaintiff, more than 500 other H–2 aliens are currently working in the Virginia tobacco harvest, and are eligible to apply for SAW status, were it not for a regulation that disqualifies them from filing their applications in the United States. The Court will hear oral argument on the class action is-

sue on Thursday, October 8, 1987, at 4:00 p.m., and make its determintion on that issue thereafter.

## II. BACKGROUND

The plaintiffs in this case are Mexican natives who last entered the United States lawfully in early July 1987, with H–2 temporary work visas authorizing them to work in the Virginia tobacco harvest. The statute authorizing the type of visa that plaintiffs hold provides that where a grower can demonstrate to the satisfaction of the Labor Department and the INS that there are insufficient American workers available for harvest requirements and that employment of temporary workers will not adversely affect the wages and working conditions of workers in the United States similarly situated, the grower can receive a certification to bring in foreign laborers. 8 U.S.C. § 1101(a)(15)(H)(ii)(a); 8 C.F.R. § 214.2(h)(3)(A). The H–2 visas are limited to the term of employment, and the employer is responsible for ensuring that the workers leave the country at the end of the harvest season. Normally, the grower arranges return transportation for the H–2 workers to their native country at the end of the harvest. Those H–2 workers who receive extensions of authorization to remain and work in this country by the INS need not depart the United States at the end of their H–2 work contract.

Plaintiffs' visas will expire upon the termination of the tobacco harvest, which is expected to occur during the last two weeks of September. Upon expiration of the visas, plaintiffs will be considered deportable aliens. Each of the plaintiffs claims eligibility to apply for SAW status, but is disqualified from submitting an application in the United States by an INS regulation. The regulation limits such applications to persons who last entered the United States before June 26, 1987. 8 C.F.R. § 210.2(c)(1). A pending application for SAW status has the effect of staying the INS from deporting the applicant, and permits the applicant to gain employment authorization.

Defendants are Edwin Meese, III, in his capacity as Attorney General of the United States, and the Immigration and Naturalization Service. Defendants are responsible for the administration of immigration laws of the United States, including the Special Agricultural Worker program.

## III. DISCUSSION

On November 6, 1986, Congress enacted the Immigration Reform and Control Act of 1986 (the "Act"), Pub.L. No. 99–603, 100 Stat. 3359, establishing several new procedures for obtaining lawful permanent resident status. Among these procedures is the Special Agricultural Worker program, pursuant to section 302 of the Act, 8 U.S.C. § 1160. Under the SAW program, aliens who worked at least 90 days in certain crops during the twelve month period ending May 1, 1986, are eligible to apply for lawful temporary resident status. 8 U.S.C. § 1160(a). Foreign agricultural workers who file nonfrivolous applications for temporary resident status under the SAW program may reside and work in the United States, as well as travel abroad without relinquishing their rights, pending the adjudication of their applications. 8 U.S.C. § 1160(a)(4). If the application passes approval, the applicant can be granted temporary resident status. This is the first step toward permanent resident status, and ultimately, naturalization as an American citizen. According to defendants, the SAW program will provide a legal agricultural workforce to take the place of the illegal aliens who have contributed to a significant share of the harvest workforce in the past.

Plaintiffs claim that their work in the 1985 and 1986 tobacco harvests in Virginia makes them eligible to apply for SAW status. An INS regulation, 8 C.F.R. § 210.-2(c)(1), *as amended by* 52 Fed.Reg. 28660, 28663 (July 31, 1987), limits the filing of applications in the United States to those workers who were physically present in the United States prior to June 26, 1987, although the application period established by Congress runs through November 30, 1988. Because plaintiffs did not arrive until July, they are disqualified from filing their applications in the United States. In order to apply for SAW status, the INS requires these late arriving laborers to re-

turn to Mexico to file their applications. At oral argument, the Assistant United States Attorney represented that the INS adopted a new policy on September 28, 1987, reflected in the declaration of an INS official and an Immigration Wire (Defendants' Exhibits B and C). The policy provides that upon initial screening of an application submitted by an alien who arrived in this country on June 26, 1987 or thereafter, the application will be returned to the applicant with directions to file it abroad. It further provides that if the applicant insists on having it filed, and pays the necessary fee, the application will be accepted with a recommendation noted on its face that it be denied.

The Act provides for filing at consular stations of the INS in Mexico, 8 U.S.C. § 1160(b)(1)(B), but plaintiffs claim that they will be unable to do so because their homes in Mexico are an average of 250 miles away from these offices and their financial situations will preclude their ability to apply. There are three sites in Mexico where aliens may file SAW applications: Mexico City, Monterey and Hermosillo. Additionally, applications may be filed by Mexico residents at a new port of entry facility in Calexico, California. *See* 8 C.F.R. § 210.2. The Act further provides for qualified designated entities ("QDE") to accept applications for SAW status. 8 U.S.C. § 1160(b)(2). There are many QDEs in the United States that are charitable organizations created to assist aliens such as plaintiffs with social services. There are no such QDEs in Mexico nor any groups to provide assistance to SAW applicants. Declaration of Luis R. Torres (Plaintiffs' Exhibit U). Plaintiffs claim that unless a preliminary injunction issues, their claims to statutory application rights will be mooted by their forced departure.

Applicants who file for a change of status within the United States are accorded substantial benefits and advantages that other applicants do not receive. The difficulties in providing the documentation of employment histories to support the applications and the lack of reliable assistance in preparing applications are among the factors that the government blames for the extremely low number of SAW applications from abroad. INS Legalization Wire No. 27, July 1, 1987 (Plaintiffs' Exhibit P). The success of an application for SAW status may well depend on the place of filing, according to plaintiffs.

Under the original regulations promulgated by the INS after the passage of the Immigration Reform and Control Act the cutoff date for applicants in the United States was November 26, 1987. *See* INS Legalization Wire No. 1, November 14, 1984. On March 19, 1987, defendants published proposed regulations to implement the SAW program at 52 Fed.Reg. 8745 (March 19, 1987). The proposed regulations imposed a physical presence cutoff date of November 6, 1986. No explanation of the authority for the cutoff date restriction was given. One hundred thirty commentators stated that the proposed regulation limiting applications within the United States to those physically present since the effective date of the Act was inconsistent with section 210(d) of the Act and its legislative history. 52 Fed.Reg. 16195, 16197 (May 1, 1987).

In its final regulations, defendants advanced the cutoff date to May 1, 1987, the date on which the final regulations were published. 52 Fed. Reg. 16195, 16200 (May 1, 1987). Defendants explained that the cutoff date was advanced to "avoid disruption of ongoing agricultural activity which might result from requiring workers currently engaged in agricultural employment to depart the United States to file applications and allow for the earliest possible admission of overseas applicants." *Id.* at 11697.

On July 31, 1987, without notice or comment, defendants published an amendment to the regulations, advancing the cutoff date to June 26, 1987. 52 Fed.Reg. 28660 (July 31, 1987). Defendants explained that the purpose of the cutoff date "is derived from the SAW provisions of the IRCA and is based on the primary objective of the statute—control of illegal immigration." *Id.* at 28661. Defendants stated that the cutoff date is "[c]onsistent with the need to eliminate the prospect of employment as a magnet for illegal immigration," and that

"[t]he establishment of a cutoff date to avert a potential flow of illegal aliens was a responsible and reasonable policy in support of the primary purpose of IRCA." *Id.* Defendants further stated that "[t]here is no contradiction if the date is adjusted in furtherance of another IRCA objective, the maintenance of agricultural production through the legalization of the workforce." *Id.* The June 26, 1987 date coincided with the opening of a border processing office at Calexico, California to accept SAW applications from Mexican applicants. *Id.* Those aliens who entered the United States on June 26, 1987 or thereafter may file their applications only at foreign processing offices having jurisdiction over their place of foreign residence. *Id.*

Defendants assert that INS has implemented a special transitional admission standard, in effect from July 1, 1987 through November 1, 1987. This transitional admission standard was implemented because of the agricultural labor shortages noticed during the spring and early summer harvests of 1987. *Id.* at 28660. Under this standard, SAW applicants at designated ports of entry into the United States can receive a 90–day work permit upon the filing of a SAW application form with photographs and the required fee. *Id.* at 28661–62. Documentary evidence can be provided within the 90–day period of the work permit's effectiveness. Passports, birth certificates, medical examinations and police records may also be required at the port of entry processing office. *Id.* According to plaintiffs, the requirement of a passport constitutes an additional, substantive eligibility requirement, not contemplated by Congress in creating the SAW program. Plaintiffs represent that in order to obtain a Mexican passport, an applicant must show proof of service in the Mexican military.

## IV. STANDARDS FOR INJUNCTIVE RELIEF

In order to issue injunctive relief in the District of Columbia, plaintiffs must show: (1) a strong likelihood of success on the merits; (2) that without an injunction, they will be irreparably harmed; (3) that the

issuance of the injunction will not substantially harm other interested parties; and (4) that the public interest favors injunction. *Virginia Petroleum Jobbers Ass'n v. FPC,* 259 F.2d 921, 925 (D.C.1958) (per curiam). The purpose of a preliminary injunction "is merely to preserve the relative positions of the parties until a trial on the merits can be held." *University of Texas v. Camenisch,* 451 U.S. 390, 395, 101 S.Ct. 1830, 1834, 68 L.Ed.2d 175 (1981).

### A. *Irreparable Injury*

Plaintiffs allege that they will be irreparably injured if a preliminary injunction is not issued. They assert that they must depart this country at the end of the tobacco harvest on the buses to the Mexican border that are provided by their employers, in order to ensure that they are out of this country by the date of expiration on their temporary visas. Even if the INS takes no formal action against them after the expiration of the visas, plaintiffs argue that they will be "constructively deported" due to their inability to obtain employment authorization or legal employment. That constructive deportation will moot their statutory right to file an application in the United States for SAW status, and constitutes irreparable harm, according to plaintiffs.

In addition, plaintiffs argue that the delay of filing their applications will cause them irreparable harm: it will cause delays of their eligibility for temporary resident status, permanent resident status, and finally their ability to apply for naturalization. All of these changes in status were contemplated by Congress in enacting the IRCA.

Defendants argue that plaintiff failed to meet the burden of showing that the requisite criteria for injunctive relief have been met. First, defendants argue that plaintiffs have failed to show irreparable injury. Defendants state that plaintiffs inaccurately characterized the expiration of the H–2 visas as "constructive deportation." Instead, defendants argue that the expiration of plaintiffs' H–2 visas is no more than what they previously agreed to upon entering this country. Further, defendants ar-

gue that plaintiffs may obtain off-year employment in Mexico. Their inablility to procure lawful employment in the United States, according to the government, does not rise to the level of irreparable harm. Neither does the inconvenience of foreign filing rise to the level of irreparable harm, according to defendants. As for plaintiffs' argument that they are unable to travel the distance to the consular offices in Mexico, defendants suggest that they were able to travel from Mexico to Virginia, arguing that the point is disingenuous.

The Court holds that plaintiffs have shown that without an injunction, they will be irreparably harmed. Under the SAW program, according to the plain language of the statute, applicants may file for a change of status in the United States. That statutory right to file will be mooted if their applications are not accepted in this country. The new policy that the government implemented on September 28, 1987 does not cure the irreparable injury that plaintiffs will likely suffer in the absence of preliminary injunctive relief. The government was unable to define the requisite "insistence" that an applicant must assert under the new policy. Furthermore, once the application is accepted at the insistence of an applicant who entered the country after the cutoff date, it is marked with a recommendation that it be denied as invalid. Any work authorization granted such an insistent applicant may be terminated upon denial of the application on grounds of late entry in this country. The delays involved in forcing plaintiffs to return to Mexico to file their applications also contribute to the Court's finding of irreparable injury.

Additionally, the lack of adequate assistance in making applications for a change in status in Mexico contribute to the Court's finding of irreparable injury. Contrary to the Government's argument, this is not merely a case of inconvenience. Congress provided a mechanism for the agricultural labor force to be converted from illegal aliens to legal aliens. In creating that mechanism, Congress imposed no date of entry limitations on the place of filing. As plaintiffs have forcefully argued, to deny plaintiffs the right of filing in this country is to deny them of the benefits of protection from deportation and work authorization, as well as the right to travel outside this country without forfeiting these benefits. Taken as a whole, the Court finds that plaintiffs have made a substantial showing that plaintiffs will suffer irreparable injury in the absence of preliminary injunctive relief.

### 1. *Standing*

Defendants also argue that plaintiffs lack standing to challenge the regulation. Defendants cite the requirement of Article III of the Constitution that plaintiffs must allege "a fairly traceable causal connection between the claimed injury and the challenged conduct." *Duke Power Co. v. Carolina Environmental Study Group, Inc.,* 438 U.S. 59, 72, 98 S.Ct. 2620, 2629–30, 57 L.Ed.2d 595 (1978). Defendants argue that plaintiffs failed to show the required causal connection, and only allege the inconvenience of filing in Mexico instead of in the United States.

As the Court has found that more is at stake here than the mere inconvenience of filing an application in Mexico, the Court holds that plaintiffs have standing to challenge the regulation that imposes a cutoff date on applications in the United States. Accordingly, the Court holds that there is a readily traceable causal connection between the regulation and the irreparable injury that plaintiffs will suffer if injunctive relief is not granted.

### B. *Harm to Defendants or the Public Interest*

Plaintiffs argue that that, at most, defendants would suffer minimal hardship, should a preliminary injunction issue. The burden, if any, of processing additional applications is ameliorated by the $185 application fee that plaintiffs would pay. Defendants stated in the Federal Register of May 1, 1987, that this fee would permit the program to be self funding.

In creating the SAW program, Congress identified a strong public interest in the assurance of an adequate farm labor force, identified by the District Court for the Eastern District of California:

Congress noted several concerns expressed by Deputy Secretary of Agriculture John R. Norton. These included dependence of the national economy and the American consumer on a "stable and adequate supply of agricultural labor to maintain commodity supplies at reasonable price levels," and the integral relationship between agricultural labor and international sales, the United States' balance of payments, and American jobs in the industries that support agriculture such as "packing, hauling, refrigeration, marketing, and other related industries." *CSS v. Meese*, 664 F.Supp. 1378, 1389 (E.D. Cal.1987) (quoting H.R.Rep. No. 682(I) at 83, 1986 U.S.Code Cong. & Ad.News at 5649, 5687).

Plaintiffs argue that no unauthorized immigration will be encouraged by the issuance of a preliminary injunction. They state that permitting individuals who have lawfully entered this country to file their SAW applications in the United States cannot provide incentive to others who enter this country illegally. The public interest will be served, according to plaintiffs, if others seek entry as lawful H-2 aliens rather than without inspection.

The government argues that the underlying rationale for the cutoff date was to preserve the credibilty of the H-2 program. The effect of granting these Virginia tobacco workers relief, according to defendants, would be to inevitably require INS to modify its regulation for all H-2 workers. The government paints a picture of harvest workers across the country walking away from their H-2 contract obligations and receiving temporary work authorization under the SAW program. Growers who depend on H-2 laborers might lose their entire workforce. *See* Declaration of Frank Heinaur (Defendants' Exhibit A).

The Court is unpersuaded by defendants' argument that the public interest and defendants will be harmed should injunctive relief issue. The rationale presented for the cutoff date, that the credibility and integrity of the H-2 program needs to be preserved, appears to have been developed by the Government for purposes of this litigation. The Court finds that the defend-

ants' argument that SAW applicants who also hold H-2 visas might leave their H-2 jobs for other jobs in the United States to be pure speculation. The government made no proffer that H-2 workers, who entered the United States prior to the cutoff date and filed applications for a change of status under the SAW program, have left their H-2 jobs or that fields of crops have been left to rot by pre-cutoff date applicants. Plaintiffs have lawfully entered the United States, and may lawfully remain upon the filing of nonfrivolous SAW applications. The Court finds that neither the defendants nor the public interest will be harmed by the issuance of a preliminary injunction.

### C. *Likelihood of Success on the Merits*

Plaintiffs argue that the imposition of a cutoff date for applications within the United States is without authority under the Act and in conflict with sections 210(b) & (d) of the Immigration and Nationality Act. They further argue that the cutoff date as applied to persons who lawfully entered the United States serves none of the stated purposes of the rule to discourage unauthorized immigration, and is arbitrary and capricious, in violation of the Administrative Procedure Act.

Plaintiffs cite to a June decision of the District Court of the Eastern District of California, *Catholic Social Services v. Meese*, 664 F.Supp. 1378 (E.D.Cal.1987), as authority for the lack of statutory authority of the rule. That Court held that the cutoff date was without authority under the statute. Chief Judge Lawrence K. Karlton issued a preliminary injunction against the Attorney General of the United States and those in his employ, prohibiting him from "excluding any alien apprehended during the period from November 6, 1986 to June 1, 1987 who can present a nonfrivolous claim for adjustment of status within the meaning of § 210(a) of [the Immigration Reform and Control Act], regardless of the date of last attempted entry into the United States." *Id.*, at 1390. The Court based its decision on the plain language of the statute, which suggests that "Congress intended that those aliens apprehended by the INS during the preapplication period

and placed in exclusion proceedings who could present a nonfrivolous claim for adjustment of status under section 210 would not be excluded." *Id.*

Plaintiffs ask the Court to follow the reasoning of Judge Karlton and submit that the precedent shows a probability of success on the merits. Plaintiffs assert that the statutory provisions in question neither explicitly nor impliedly grant legislative power to the INS or the Attorney General. The Court has a duty, according to plaintiffs, to interpret the provisions. The plaintiffs assert that the plain language of the statute is clear and unambiguous, but they extensively cite to the legislative history in support of their arguments. The statute on its face does not impose an entry cutoff date for applying for SAW benefits within the United States. According to plaintiffs, the cutoff date also violates section 210(d)(2), which prohibits the Attorney General from deporting or excluding or denying employment authorization to any alien who has filed a nonfrivolous application for SAW status. The legislative history specifically rejects a requirement of continuous physical presence in this country as a criterion of eligibility. *See* H.R.Conf.Rep. No. 1000, 99th Cong., 2d Sess., *reprinted in* 1986 U.S.Code, Cong. & Ad.News 5840, 5851. Congress did not limit the benefits under SAW on the basis of an alien's presence, although it has provided such limits in other immigration provisions.

The government argues that plaintiffs have failed to establish the likelihood of success on the merits. The government maintains that the cutoff date was necessary to protect the integrity of the H-2 program in the United States and of the growers who depend on it. As previously noted, the government paints a picture of rotting crops in the fields in the event that harvest labor is not available. If an H-2 worker applies for SAW status, according to the government, the grower may not compel his services in completing the contractual obligations. The SAW worker may seek employment elsewhere.

Defendants also argue that judicial review under the statute involved is limited. The statute provides: "There shall be no administrative or judicial review of a determination respecting application for adjustment of status under this section, except in accordance with this subsection." IRCA § 210(e). Defendants submit that an administrative challenge should have been made or included in an application, rather than a suit filed in court. Judicial review is only available in the courts of appeals upon the order of exclusion or the deportation of an applicant, according to defendants. IRCA § 210(e)(2)(A). A prerequisite to judicial review is the exhaustion of administrative remedies. Finally, defendants argue that the public interest would not be served by injunctive relief, because the entire H-2 program would lose credibility. The effect of an injunction, according to defendants, would require modification of the rule as to all H-2 workers. The government fears that harvest workers all over the United States would walk away from their jobs, if given SAW status. That harm would substantially outweigh the inconvenience to plaintiffs, according to defendants.

The Court concludes that plaintiffs have shown a likelihood of success on the merits. This Court agrees with the California District Court's order that the plain language of the statute, as well as its legislative history, reflect no intent on the part of Congress to limit the applications filed in the United States to those aliens who entered the country prior to June 26, 1987, a date that government counsel conceded to be "a little arbitrary." The Court is persuaded that the regulation imposing the cutoff date is without authority under the statute, and that it is arbitrary.

Although Courts often defer to the expertise of agencies in interpreting statutes that they administer, it is for the courts to determine whether an agency's interpretation of a statute is inconsistent with the intent of Congress. The statutory limitation on judicial review that defendants argue precludes this Court from exercising jurisdiction over this case does not apply here. The Supreme Court has stated that " '[t]he judiciary is the final authority on issues of statutory construction and must

reject administrative constructions which are contrary to clear Congressional intent.' " *INS v. Cardozo–Fonseca,* —— U.S. ——, 107 S.Ct. 1207, 1221, 94 L.Ed.2d 434, 55 U.S.L.W. 4313, 4320 (1987) (quoting *Chevron U.S.A., Inc. v. Natural Resources Defense Counsel,* 467 U.S. 837, 843 n. 9, 104 S.Ct. 2778, 2781 n. 9, 81 L.Ed.2d 694 (1984)). In other words, the Court will never defer to the expertise of an agency in interpreting a statute where the agency has made an interpretation contrary to the statute.

In reaching its conclusion, the Court finds that the plain meaning of the statute is clear and unambiguous. The statute provides for the filing of applications in the United States or in American consulates. The filing provision imposes no limitations on filing, except the following criteria of eligibilty: (1) that the applicant has resided and worked for at least 90 days in certain crops in this country during the twelve-month period prior to May 1, 1986; (2) that the applicant is admissible as an immigrant; and (3) that the applicant files a nonfrivolous application prior to December 1, 1988.

As the California Court found, this Court is persuaded that, although the section permits applications to be filed at consulates in Mexico, there is nothing in the statute that requires aliens to apply either inside or outside of the United States, depending on their date of entry. The Court cannot conclude from the statute's sparse legislative history that Congress intended to impose any physical presence requirement. Indeed, part of the legislative history reflects the specific rejection by Congress of a requirement of continuous physical presence in the United States as a prerequisite for filing an application for SAW status or for the benefits conferred under the SAW program. H.R.Conf.Rep. No. 1000, 99th Cong., 2d Sess., *reprinted in* 1986 U.S. Code, Cong. & Ad.News 5840, 5851.

The Court further finds that in the case at hand, the stated purpose of the cutoff date—controlling illegal immigration—will not be served by its imposition on plaintiffs. *See* 52 Fed.Reg. 28660, 28662–63 (July 31, 1987). Plaintiffs are legally present in the United States and may lawfully remain upon filing their nonfrivolous SAW applications. The Court is unpersuaded that plaintiffs will abandon their obligations to the Virginia tobacco growers. Indeed, that harvest has almost been completed. Thus, the imposition of the arbitrary cutoff date on plaintiffs serves no purpose that the Court can determine, other than to force plaintiffs to leave this country without allowing them to make their SAW applications here.

## V. CONCLUSION

This is a preliminary injunction. The Court finds that, according to the standards stated by the United States Court of Appeals for the District of Columbia Circuit, plaintiffs have shown that without a preliminary injunction they will be irreparably harmed. The Court further finds that plaintiffs have demonstrated a likelihood of success on the merits. Finally, the Court finds that the issuance of an injunction will harm neither defendants nor the public interest. The plain language of the statute, which Congress presumably passed in the public interest, suggests that Congress did not intend to limit applications filed in the United States to those aliens physically present in the United States prior to June 26, 1987. Congress required only that applications be filed prior to December 1, 1988, which is the cutoff date of the application period.

## ORDER

Upon consideration of plaintiffs' motion for a preliminary injunction, defendants' opposition thereto, the oral arguments presented by counsel in open court, the entire record herein, and for the reasons stated in the accompanying memorandum, it is by the Court this 2nd day of October, 1987,

ORDERED that Defendants Edwin Meese, III, as Attorney General of the United States, and the United States Immigration and Naturalization Service ("INS"), and all persons acting by, through, or under them, or subject to their control or supervision, be and hereby are enjoined as follows:

1. From refusing to accept or marking as invalid or requiring insistence by the applicant, or taking adverse action on any nonfrivolous application for adjustment of status under section 210 of the Immigration and Nationality Act ("I & NA"), filed by any plaintiff in the above captioned case, who is present in the United States and who last entered with a temporary visa issued pursuant to 8 U.S.C. § 1101(a)(15)(H)(ii) or its current cod-

ification at 8 U.S.C. § 1101(a)(15)(H)(ii)(a) ("H–2" and "H–2A" aliens) to work in the Virginia tobacco harvest, on the basis of the alien's last date of entry in the United States on June 26, 1987 or thereafter.

2. From failing to accord to plaintiffs who entered to work in the Virginia tobacco harvest and who file nonfrivolous applications for adjustment of status under section 210 of the I & NA, on the basis of the date of their last entry into the United States, all of the rights and benefits under the immigration laws and under INS policies to which an individual who has filed a nonfrivolous application is entitled, including employment authorization and immunity from deportation or exclusion pending adjudication of the application.

3. From failing to consider as eligible to file applications for adjustment of status under section 210 of the I & NA within the United States, plaintiffs who last entered the United States on June 26, 1987 or thereafter to work in the Virginia tobacco harvest.